# EXHIBIT 1

FOOD SERVICES AGREEMENT
Between
Bon Appétit Management Company
and
Albion College

THIS AGREEMENT is made as of June 8, 2011 by and between Albion College, with principal offices located at 611 E Porter Street, Albion MI 49224 ("Client" or "Albion College" or "College"), and Bon Appétit Management Company, a California corporation ("Bon Appétit") (individually, the "Party" and collectively, the "Parties").

WHEREAS, Client desires to avail itself of Bon Appétit's food services; and

WHEREAS, Bon Appétit desires to perform such services for Client;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties hereto, intending to be legally bound hereby, agree as follows.

## 1. CLIENT'S GRANT TO BON APPÉTIT

Client grants to Bon Appétit, as an independent contractor, the exclusive right to provide and manage the Client's food service program including catering service (manual foodservice hereinafter referred to as "Services," "Food Service" or "Food Service Program") on the campus of the Albion College (the "Premises") and the exclusive right to sell to students, employees, guests and other persons at such Premises food products, non-alcoholic beverages and other such articles ("Products") as shall be approved by the Client. Bon Appétit shall render the Food Services within the facilities of the Premises, including but not limited to, the food preparation, serving, dining and storage areas ("Facilities") designated for the Food Service Program. Bon Appétit's exclusive rights do not include vending, fraternities, the campus bookstore, athletics concessions, student business ventures, special student events and Albion1Card merchant program.

## 2. COMMENCEMENT AND TERMINATION

A. This Agreement shall become effective as of July 1, 2011 and shall remain in force until June 30, 2016, unless terminated earlier as provided in Section 2.B or 2.C ("Term"). If neither Party has provided notice of termination at least ninety (90) days in advance of June 30, 2016, or June 30 of each year thereafter that this remains in effect, and if neither Party has terminated the Agreement early under Section 2.B. or 2.C., the Agreement will renew automatically for a one-year period. The Agreement may renew automatically in accordance with the preceding sentence no more than five times.

B. Notwithstanding the above, either Party may terminate this Agreement without cause by providing notice of termination in writing ninety (90) days prior to the proposed termination date.

C.  If either Party shall refuse, fail or be unable to perform or observe any of the terms or conditions of this Agreement for any reason other than Excused Performance reasons stated herein, the Party claiming such failure may give the other Party a written notice of such breach. If the failure has not been corrected within ten (10) days from such notice, the non-breaching Party may terminate this Agreement by sending a termination notice that is effective no sooner than ten (10) days after that notice is given.  Termination is without prejudice to any other available remedy.

D.  In the event of a termination for any reason, all amounts outstanding shall become due and payable to Bon Appétit within thirty (30) days after termination.

E.  Upon the termination or expiration of this Agreement, Bon Appétit shall, as soon thereafter as is feasible, but in no event later than thirty (30) days after the effective date of termination or expiration of this Agreement, vacate all parts of the Premises occupied by Bon Appétit, remove its equipment (if applicable) and return the Facilities to Client, together with all the equipment furnished by the Client pursuant to this Agreement, in the same condition as when originally made available to Bon Appétit, excepting reasonable wear and tear, fire and other casualty loss.

F.  The termination or expiration of this Agreement shall not affect the rights, privileges, liabilities and/or responsibilities of the Parties as they exist as of the effective date of termination.  The Parties shall cooperate fully with each other during the Term of the Agreement and subsequent thereto in order to ascertain and satisfy the liabilities of either Party to the other.

## 3. BON APPÉTIT'S RESPONSIBILITIES

A.  Bon Appétit shall render its Services with appropriate merchandise of good quality at reasonable prices in accordance with both the service expectations below and with those line items in Exhibit B checked under "BAMCO."  Service expectations are as follows:

(1)    Demonstrate a culinary culture with a passion for food, including: cooking from scratch with authentic ingredients; sourcing fresh local produce and other products from local farmers; serving great tasting and nutritious food; and creating a special dining program customized to fit the needs of Albion College.

(2)    Serve a wide variety of menu items at each meal, keeping things fresh, fun, and interesting.

(3)    Demonstrate culinary talents with display cooking in front of guests.

(4)    Offer a restaurant-quality dining experience.

(5)    Support sustainability initiatives, including being socially responsible for the well-being of students, staff, guests, communities and the environment.

(6)    Offer plentiful vegetarian options at every meal.

(7)    Ensure that healthy menu items are a mainstream offering throughout all operations.

(8)    Plan and execute catering events that both feed and inspire people.

(9)    Offer promotional events that recognize unique campus events and celebrate food and dining.

(10)   Provide customer service that enhances the dining experience.

(11)   Develop programs and standards that ensure quality and enforce food safety.

B.  Bon Appétit shall be responsible for development and implementation of an Annual Plan for the successful continuation of the Food Service Program for each year of the Term (the "Annual Plan"). This is required by August 1, 2011 with respect to the 2011-12 contract year, and on or before February 1, 2012 with respect to the 2012-13 contract year, and every succeeding February 1 during the term with respect to the following contract year. The Annual Plan should be based on identified goals and objectives as established and determined in collaboration with the Client's management. It is understood that the Annual Plan will consist of a projection based on predicted programmatic features and estimated financial results. The plan must include each of the following in detail reasonably acceptable to the Client:

(1)    Evaluation of Albion College's dining program versus best practices in collegiate dining.

(2)    On-campus and peer-campus surveys.

(3)    Meal plan configuration, pricing, policies, and recommendations.

(4)    Catering menus, pricing, and policies.

(5)    Residential dining and retail menus, concepts, and hours of operation.

(6)    Wellness programs.

(7)    Financial projections: revenue and expense by month/year.

(8)    Capital expenditure recommendations.

(9)    Continuous improvement plan.

(10)   Marketing plan.

C.  Bon Appétit shall comply with all federal, state and local laws and regulations, including but not limited to those governing health and safety, non-discrimination, wages and hours of employment, and the preparation, handling and serving of foods. Bon Appétit shall procure and keep in effect all licenses and permits required by law and shall post such permits as required by law. Bon Appétit shall comply with applicable federal, state and local laws and regulations pertaining to wages and hours of employment. In accordance with Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans' Readjustment Act of 1974, as amended, the Parties hereby incorporate the requirements of 41 C.F.R. §§60-1.4(a)(7), 60-250.5 and 60-741.5, if applicable.

D.  Bon Appétit shall (1) hire all employees necessary for the performance of this Agreement, (2) hire qualified existing non-management staff covered by the existing Collective Bargaining Agreement between Albion College – Albion, Michigan and MEA/NEA, representing the Albion College Educational Support Personnel Association Facilities Operations – Dining And Hospitality Services Employees dated July 1, 2009 –

June 30, 2012, and (3) give preferential consideration to qualified existing management and part-time staff. All employees (excluding those previously employed by Client) shall be subject to a background check and to such health examination as proper federal, state and local authority may require in connection with their employment as a condition of employment with Bon Appétit. All persons employed by Bon Appétit will be the employees of Bon Appétit and not employees of Albion College. Bon Appétit will maintain employee dishonesty insurance for the benefit of the Client and Bon Appétit, which will be applicable to all of its employees. In performing work required by this Agreement, Bon Appétit shall not discriminate against any employee or applicant for employment because of race, religion, sex, color, national origin, sexual orientation, age, or other legally protected characteristic, in violation of federal, state or local law.

E. Bon Appétit must keep all records pertaining to work performed in accordance with this Agreement for a period of six (6) years from the date the record is made or longer if required by any proper federal, state, or local authority. Bon Appétit shall, upon reasonable notice, give the Client or its authorized representative the opportunity at a reasonable time during normal business hours to inspect, examine, audit and copy such of Bon Appétit's business records which are directly relevant to the financial arrangements set forth in Exhibit A, which is attached hereto and incorporated herein by this reference. The cost of such inspection, examination and audit will be at the sole expense of the Client and such inspection, examination and audit shall be conducted at the Bon Appétit locations where said records are normally maintained.

F. Bon Appétit agrees that its employees, vendors, and agents shall comply with and observe all applicable rules and regulations concerning conduct on the Premises that Client imposes upon Client's employees, vendors, and agents. Bon Appétit further agrees that its employees, vendors, and agents shall not discriminate against, harass, assault or engage in other unlawful conduct toward the Client's employees, students, or other persons on the Client's Premises.

G. Client currently has an exclusive beverage contract with Pepsi Bottling Group, an exclusive linen rental contract with Sohn Linen Service, and an exclusive custodial contract with ABM Janitorial Services. Client shall provide copies of such agreements to Bon Appétit prior to the commencement of this Agreement, and shall not amend or modify same without giving Bon Appétit prior written notice. Client is excused from any of its obligations under this agreement to the extent they conflict with Client's obligations under any of those contracts. Bon Appétit shall adhere to all aspects of these established agreements, as well as any other current or future contracts entered into by the Client. Notwithstanding the foregoing, Client will ensure that any such agreements do not impair the quality of the food and beverage items served by Bon Appétit (as compared to comparable items served at other similar venues in which Bon Appétit or its affiliates provides food and beverage service) or increase the costs for such items (as compared to the Bon Appétit pricing for comparable items of similar size and quality).

H. Bon Appétit shall:

(1) Allow designated College personnel to have access at all times to all spaces assigned to Bon Appétit. The College will maintain keys and access cards to all facilities.

(2) Perform procedures for cash collection and handling in accordance with the College's requirements.

(3) Promptly notify College management of any unsafe, unlawful or unhealthy conditions of any type of which Bon Appétit becomes aware, and, to the extent Bon Appétit is responsible for such conditions, take appropriate action to remedy the condition(s).

(4) Inform College management of any personal injuries and accidents, which require medical treatment, as well as actions or activities of Bon Appétit employees that occur on College premises resulting in police or other emergency response.

(5) Provide an inventory of all equipment and smallwares to College management annually on June 30th.

I.    For events where alcoholic beverages are served by Bon Appétit employees, such employees shall be required to be trained and certified in service of alcohol. Upon request, proof of certification shall be provided to the College. Any service of alcohol shall be done in accordance with College policies as well as state and local laws, regulations and ordinances.

J.    Bon Appétit shall continue to provide services under the contract in the event of strikes and other labor disturbances, it being understood that such services shall not be limited in nature. Bon Appétit shall be required to provide food service under emergency and/or unpredictable circumstances such as equipment failure, fire, pandemic, power failure, weather emergencies, etc, it being understood that such service may be limited in nature. The College reserves the right to immediately close dining facilities and/or operations to protect the health of students, employees, and guests.

K.    In addition to those responsibilities above, an additional list of the Parties' responsibilities is set forth in Exhibit B, which is attached hereto and incorporated herein by this reference. Exhibits C and D outline locations and hours of operation, respectively, and are attached hereto and incorporated by this reference.

4. CLIENT'S RESPONSIBILITIES

A. Client shall, without cost to Bon Appétit, provide Bon Appétit with the necessary space for the operation of the Services and shall furnish, without cost to Bon Appétit, all utilities and Facilities reasonable and necessary for the efficient performance of this Agreement by Bon Appétit. As of the date of this agreement, Albion College represents that its facilities, equipment and utilities are adequate to provide Bon Appétit services as

is, and Bon Appétit accepts Client's facilities as is and acknowledges they are presently adequate for Bon Appétit services.

B.  Client shall, at its cost and expense, provide the Facilities, equipment and floor space necessary for the efficient provision of Bon Appétit's Services hereunder. The Client shall maintain, repair and replace said equipment and Facilities at its own expense. The Client shall keep such equipment and Facilities maintained in a safe operating condition such that no Bon Appétit employee is exposed to or subjected to any unsafe situation which would violate the Occupational Safety and Health Act including, but not limited to, the general duty and the specific duty clauses thereof or any other similar federal, state or local law or regulation. However, if equipment provided by Client becomes inoperative, hazardous or inefficient to operate, Bon Appétit will contact Albion Colleges' facility maintenance and provide it with an opportunity to correct the situation before ordering repairs to the equipment by a third party. Client shall permit Bon Appétit to have the use of all such equipment and Facilities in the performance of its obligations hereunder, subject to the duty to exercise reasonable care in the use thereof. Bon Appétit agrees that all equipment and items of equipment now or hereafter furnished by the Client to Bon Appétit are the sole property of the Client and Bon Appétit agrees not to change, deface, or remove any symbol or mark of identity upon said equipment or items of equipment furnished by the Client.

C.  All employee benefits accrued by the Client or the previous food service management provider prior to the commencement date of this Agreement shall be paid as a cost to the Client.  Bon Appétit will pay only those employee benefits accrued during the Term of this Agreement.

D.  Client shall provide Bon Appétit with access to its board plan tracking systems to enable Bon Appétit to track and reconcile student meal plan participation in the meal plans, as wells as actual meal plan and declining balance usage, and to enable Bon Appétit to generate reports to assess metrics of the Dining Service Program.  Client shall notify Bon Appétit in writing of changes to meal plans.

5.  FINANCIAL ARRANGEMENTS

The financial arrangements of this Agreement are set forth in Exhibit A. The financial terms have been negotiated between the Parties upon the condition that Client will require all students residing on the Premises to participate in a meal plan excluding fraternity housing, annex housing with cooking facilities, commuters and exceptional situations as determined by the Client, and that Bon Appétit will operate its Services at the same points of Service and remain in operation only the hours listed in Exhibits C and D when Bon Appétit begins operations hereunder.

Client may change the meal plan participation requirement and may desire Bon Appétit to operate its Services for additional points of Service and/or additional hours.  In such circumstances, Client and Bon Appétit shall mutually agree on the appropriate financial

arrangements for the new level of meal plan participation and additional points of Service and/or additional hours.

## 6. INDEMNIFICATION AND INSURANCE

A.  To the fullest extent permitted by law, each Party shall indemnify, defend and hold the other harmless from any and all losses, damages or expenses, including reasonable attorneys' fees, arising out of or resulting from claims or actions for bodily injury, death, sickness, property damage or other injury or damage caused by any negligent act or omission of such Party, any willful misconduct of such Party, or any breach by such Party of its obligations under this Agreement.

B.  A party seeking indemnification must give prompt written notice to the Party obligated to provide indemnification (the "Indemnifying Party") of any claim, action or demand for which indemnity is claimed; control of the investigation, preparation, defense and settlement thereof by the Indemnifying Party; and such reasonable cooperation by the Indemnified Party, at the Indemnifying Party's request and expense, in the defense of the claim.  The foregoing notwithstanding, failure or delay in giving notice does not affect the obligation to indemnify except to the extent that the failure or delay causes prejudice to the indemnifying party.  The Indemnified Party shall have the right to participate in the defense of a claim with counsel of Indemnifying Party's choice and at its expense.  The Indemnifying Party shall not, without the prior written consent of the Indemnified Party (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment that imposes any liability upon the Indemnified Party.

C.  Bon Appétit shall obtain and maintain insurance for the following risks in such amounts under such policies as indicated, it being understood that minimum required policy limits may be required through a combination of primary and excess insurance: general liability, $2,000,000 (including contract, liquor, products-completed operations); automobile liability, $1,000,000; umbrella liability, $5,000,000; and Workers' Compensation, $1,000,000 (including employer's liability coverage).

D.  Bon Appétit must deliver to Client certificates of insurance for such coverage and, excluding Worker's Compensation coverage, naming the Client as an additional insured before commencing operations.

E.  Client shall obtain and maintain insurance for the Premises, equipment, offices and utilities against risks covered by standard forms of fire, theft and extended coverage in such amounts under such policies as appropriate.

F.  Each Party has the obligation and responsibility to adequately insure its real and/or personal property against loss or damage caused by fire and extended coverage perils. The Parties waive all rights of recovery against each other and their subsidiaries, officers, directors, trustees, volunteers and employees, including subrogation rights, for such loss or damage to the waiving Party to the extent of insurance proceeds actually received.

7. TAXES AND ASSESSMENTS

A. Bon Appétit shall pay when due all federal, state, local and other governmental taxes or assessments in connection with the operation and performance of the Services, with the exception of sales tax. The Parties acknowledge that even if the Client is tax exempt, Client may be liable for the remittance of state sales tax for the sale of food, beverages, meals and/or Services. Bon Appetit will endeavor to structure its purchases on the Client's behalf to maximize the application of Client's tax exempt status for sales tax purposes, and Client shall cooperate with such efforts, including execution of any documents required to utilize such tax exempt status.

B. Based on relevant statutes, the Parties will determine whether the sales of food and beverages ("Service Transactions") are subject to sales, gross receipts or similar tax. The Parties will then determine whether the sales, gross receipts or similar tax will be collected by Client or Bon Appétit for remittance to the appropriate state department of revenue. If Client is liable for such sales, gross receipts or similar tax, Client's tax liability will not be waived by Bon Appétit either collecting the tax or accounting for the tax in its operations.

C. The Client shall pay when due all federal, state, local and other governmental use and property taxes or assessments arising in connection with the Premises, Facilities, equipment, offices and utilities. Bon Appétit shall pay when due all property taxes on its personal property and all license and permit fees in connection with Services. The Client shall reimburse Bon Appétit for all license and permit fees paid in connection with Services.

8. CONFIDENTIALITY

In the course of providing Services hereunder, the Parties may be exposed to trade secrets or other confidential or proprietary information and materials of the other Party which includes, but is not limited to, menus, recipes, signage, food service surveys and studies, management guidelines, procedures, operating manuals and software, all of which shall be identified as confidential ("Confidential Information"). The Parties agree to hold in confidence and not to disclose any Confidential Information during the Term of this Agreement and for two (2) years afterward, except that the Parties may use or disclose Confidential Information: (a) to its employees and affiliates or others to the extent necessary to render any service hereunder, provided that the other Party is first notified of the information that will be provided to any party outside of this Agreement and provided further that such information is disclosed only after such party is required to maintain it in confidence as required hereunder; (b) to the extent expressly authorized by either Party; (c) to the extent that at the time of disclosure, such Confidential Information is in the public domain, or after disclosure, enters the public domain other than by breach of the terms of this Agreement; (d) that is in the possession of either Party at the time of disclosure and is not acquired directly or indirectly from the other Party; (e) that is subsequently received on a non-confidential basis from a third party having a right to

provide such information; or (f) as required by order during the course of a judicial or regulatory proceeding or as required by a government authority. The Parties agree not to photocopy or otherwise duplicate any Confidential Information without the express written consent of the other Party. Each Party's Confidential Information shall remain the exclusive property of the Party and shall be returned to the other Party upon termination or expiration of this Agreement. In the event of any breach of this provision, the Parties shall be entitled to equitable relief, in addition to all other remedies otherwise available to it at law. This provision shall survive the termination or expiration of this Agreement.

The privacy of all student information is protected by state and federal law. For the purposes of this Agreement, any data provided by the College, and any other personal information about students, shall be considered confidential information and shall not be used by Bon Appétit except for the purposes of providing the services set forth in this Agreement. Bon Appétit shall adhere to the Albion College Privacy Rights policy found in the Student Handbook and provided to Bon Appétit in writing.

## 9. INDEPENDENT CONTRACTOR RELATIONSHIP

It is mutually understood and agreed that an independent contractor relationship is hereby established under the terms and conditions of this Agreement.

## 10. EMPLOYEES

It is mutually understood and agreed that employees of Bon Appétit are not nor shall they be deemed to be employees of Client and that employees of Client are not nor shall they be deemed to be employees of Bon Appétit. Bon Appétit's employees performing any work on the Premises shall be subject to the rules and regulations established by the Client as reasonable and necessary for its Premises, the Food Service Facilities, equipment, offices and utilities. During the Term of this Agreement and for one (1) year thereafter, neither Party may solicit to hire, hire or contract with the other Party's "Managerial Employees." "Managerial Employees" are employees who (1) worked for the other Party within one year prior to termination or expiration of the Agreement, and (2) who managed any Services or employees of the other Party or who earned over $25,000 per year. Client will not permit Managerial Employees of Bon Appétit to be employed on the Client's Premises, for a period of one (1) year subsequent to the termination or expiration of this Agreement (unless such employees were formerly employees of the Client) whether as an individual or as owner, partner, majority stockholder, director, officer or employee of a food service provider. In the event of any breach of the non-solicitation obligations contained in this paragraph, the breaching Party shall pay and the injured Party shall accept an amount equal to twice the annual salary of the relevant employee as liquidated damages.

11.  SPONSORSHIP

Bon Appetit and the Client recognize the value of securing sponsorship relationships for the Client.  Client and Bon Appétit agree that they will not compromise the quality of the food and beverage Items served in the dining facilities in order to secure a sponsorship.

12.  STUDENT EMPLOYEES AND STUDENT WAGES

If the Client has a student work program, the Client may assign such number of student workers as waiters, dishwashers, cleaning personnel and other kitchen help as the Client and Bon Appétit shall agree, subject to the following terms and conditions.

> A.  Bon Appétit acknowledges that student employees remain employees of Client, and Client has ultimate control over their employment status.

> B.  Client will retain any federal funds received for work/study students.

> C.  Bon Appétit shall have full daily supervision of all such student help in connection with their employment hereunder.

> D.  Bon Appétit shall be responsible for the complete training of student employees as it relates to their specific job duties, in particular student waiter/waitress staff.

> E.  Students will be compensated according to Client's student employment schedule unless otherwise agreed upon.

13.  BON APPÉTIT'S TITLE TO EQUIPMENT

All equipment, installed by Bon Appétit pursuant to the provisions of this Agreement is and shall at all times remain the property of Bon Appétit, with title vested in Bon Appétit. Client shall have no property interest in said equipment. Client agrees to permit only employees and agents of Bon Appétit to move, remove, open or tamper with the equipment of Bon Appétit.  Client may require Bon Appetit to relocate equipment for safety or security reasons.

14.  PROPRIETARY MARKS

The Client acknowledges that the names, logos, service marks, trademarks, trade dress, trade names and patents, whether or not registered, now or hereafter owned by or licensed to Bon Appétit or its affiliated and parent companies (collectively "Marks") are proprietary Marks of Bon Appétit.  The Client will not use the Marks for any purpose except as expressly permitted in writing by Bon Appétit.  Upon termination of this Agreement, the Client shall discontinue the use and display of any Marks and shall allow Bon Appétit to remove all goods bearing any Marks.—Marks include, but are not limited

to, Bon Appétit, BAMCO, Food Services for a Sustainable Future, Farm to Fork, Eat Local Challenge, Low Carbon Diet Day, and Bravo.

Bon Appétit acknowledges that the names, logos, service marks, trademarks, trade names and patents, whether or not registered, now or hereafter owned by or licensed to Albion College (collectively "Marks") are proprietary Marks of the College. Bon Appétit will not use the Marks for any purpose except as expressly permitted in writing by the College. Upon termination of this Agreement, Bon Appétit shall discontinue the use and display of any Marks and shall return to the College all goods bearing any Marks.

## 15.  INFORMATION TECHNOLOGY SYTEMS

In connection with the services being provided hereunder, Bon Appétit may need to operate certain information technology systems not owned by Client ("Non-Client Systems"), which may need to interface with or connect to Client's networks or information technology systems ("Client Systems"). Bon Appétit shall be responsible for all Non-Client Systems, and Client shall be solely responsible for Client Systems, including taking the necessary security and privacy protections as are reasonable under the circumstances. If Non-Client Systems interface with or connect to Client Systems, then Client agrees to work with Bon Appétit, at its own expense, to determine the impact on Bon Appétit's compliance with the Data Protection Rules, and make any necessary changes to ensure such compliance. Client will provide Bon Appétit, within a reasonable time period, notice of any change to its policies pertaining to Client Systems, or change in configuration of Client Systems, in order that Bon Appétit may assess the impact of such change upon the security of Non-Client Systems. Each party shall indemnify, defend and hold harmless the other party from all claims, liabilities, damages and costs (including reasonable lawyer's fees) to the extent caused by the indemnifying party's failure to comply with its obligations in this section.

## 16.  EXCUSED PERFORMANCE

Bon Appétit will notify the Client promptly, in the event that performance of any terms or provisions hereof (other than obligations to make payments that have become due and payable pursuant to this Agreement) shall be delayed or prevented because of compliance with any law, decree, or order of any governmental agency or authority, either local, state, or federal, or because of riots, war, public disturbances, differences with workmen, fires, floods, Acts of God, pandemic, epidemic, or any other reason whatsoever which is not within the control of the Party whose performance is interfered with and which, by the exercise of reasonable diligence said Party is unable to prevent, the Party so suffering may at its option suspend, without liability, the performance of its obligations hereunder during the period such cause continues and may extend the Term of this Agreement for the period of such suspension of the performance of duties hereunder. This section does not apply, however, to strikes, other labor disturbances, or emergency or unpredictable circumstances under which Bon Appétit has a duty to provide services under section 3-J.

## 17. ASSIGNMENT

Neither Bon Appétit nor Client may assign or transfer this Agreement, or any part thereof, without the written consent of the other Party.

## 18. ENTIRE AGREEMENT AND WAIVER

This Agreement constitutes the entire Agreement between the Parties with respect to the provision of Bon Appétit's Services and supersedes all other written or oral understandings or agreements between the Parties with respect to the provision of Bon Appétit's Services on the Premises. No variation or modification of this Agreement or attached Exhibits and no waiver of their provisions shall be valid unless in writing and signed by the duly authorized officers of Bon Appétit and Client.

## 19. SEVERABILITY

Each term and condition, article, paragraph and subparagraph of this Agreement and any portion thereof, will be considered severable. If, for any reason, any portion of this Agreement is determined to be invalid, contrary to or in conflict with any applicable present or future law, rule or regulation in a final ruling issued by any court, agency or tribunal with valid jurisdiction, that ruling will not impair the operation of or have any other effect upon, any other portions of this Agreement; all of which will remain binding on the Parties and continue to be given full force and effect.

## 20. NOTICES

Any notice (whether notice is a demand, permission, or other decision or communication) permitted or required under this agreement must be in writing, have its postage prepaid by the sender, and for mailed, facsimile, or electronic mail delivery, must be addressed to the recipient at the address listed below or to the address most recently provided by the sender to the recipient for formal notices after this agreement is signed. Notice is deemed given upon the earliest of: actual receipt; hand delivery in person; five days after being deposited in the United States first class mail; one business day after being deposited with a nationally recognized private overnight mail or courier service such as FedEx or UPS for next business day delivery; or the same business day the notice is sent by facsimile or electronic mail if sent before 5:00 p.m. local time in the recipient's time zone (otherwise facsimile or electronic mail notice is deemed given on the next business day).

To Client:            Albion College
                      Attention: Dr. Michael L. Frandsen
                      611 E Porter Street
                      Albion, MI 49224
                      Facsimile No. 517-629-0505

To Bon Appétit:       Bon Appétit Management Co.
                      Attention: Mr. Fedele Bauccio, Chief Executive Officer
                      100 Hamilton Avenue
                      Palo Alto, CA 94301



with copies to:              Compass Group USA, Inc.
                             Attention: General Counsel
                             2400 Yorkmont Road
                             Charlotte, North Carolina 28217
                             Facsimile No. 704-329-4010

                             Bon Appétit Management Co.
                             Randy De Mers, Regional Manager
                             404 Lincoln Ave
                             Erie, PA 16505
                             Facsimile No. 814-879-0797

### 21.   GOVERNING LAW

This Agreement shall be governed by the laws of the State of Michigan, without giving effect to its choice of law principles.

### 22.   SETOFF

Either Party may deduct any sums owing from the other Party from any payments due to the other Party under this Agreement.

### 23.   NO LEASE

This agreement gives Bon Appétit no right of possession to real estate and is not a lease under Michigan law.

IN WITNESS WHEREOF, the Parties have hereunto set their hands and seals as of the day and year first above written.

Albion College                           Bon Appétit Management Company

By: _____      By: _____
     Dr. Michael L. Frandsen            Fedele Bauccio
 Vice President for Finance & Administration    Chief Executive Officer

Date: _____    Date: _____

# EXHIBIT A

## FINANCIAL ARRANGEMENTS

### Albion College

A.    **Management Fee Basis**

1.  Bon Appétit shall provide the services hereunder on a Management Fee basis whereby Bon Appétit shall receive a Management Fee, as described herein, and shall be reimbursed for the Bon Appétit Costs of Business, as defined herein.  Client shall pay all of the Client Costs of Business, as defined herein.  Client will pay an annual Management Fee to Bon Appétit as follows:

(a)  Year one (July 1, 2011 – June 30, 2012):  a Base Management Fee of the greater of $50,000 or 1% of revenues, plus 50% of the excess of Revenues Minus Costs of Business over $1,450,000.  The total Management Fee for year one may not exceed 3% of revenues

(b)  Year two (July 1, 2012 – June 30, 2013):  a Base Management Fee of the greater of $100,000 or 2% of Revenues, plus 50% of the excess of Revenues Minus Costs of Business over $1,450,000.  The total Management Fee for year two may not exceed 3% of Revenues.

(c)  Years three (July 1, 2013 – June 1, 2014) and beyond: a Base Management Fee  of the greater of $150,000 or 3% of revenues, plus 50% of the excess of Revenues Minus Costs of Business over $1,450,000.  There is no cap on the Management Fee that can be earned.

2.  "Revenues" shall mean all moneys received for sales or Services rendered by Bon Appétit at or from the Premises, excluding sales, gross receipts and other taxes collected by Bon Appétit or any other vendor as required by governmental authorities.  "Revenues Minus Costs of Business" means, when calculating the additional management fee, Revenues Minus Costs of Business, as defined below, and including the base Management Fee.

3.  Bon Appétit will invoice Client for one-tenth of the estimated annual management fee, based on the Annual Plan, or $150,000, whichever is greater, in ten equal monthly installments beginning in August of each contract year.  Payment by Client is due in accordance with the terms described in E below.  No later than July 31 following that tenth payment, Client will calculate the difference between the actual management fee owed and the estimate paid.  Any amount owing to Bon Appétit will be added to the Client's Advance Payment (see F. below).  Any overpayment will be subtracted from that next Advance Payment.

4.  Client shall pay to Bon Appétit an amount equal to Bon Appétit's Cost of Business.  Costs of Business shall be determined on an accrual basis and shall consist of those items defined in Exhibit E in order for Bon Appétit to execute the responsibilities set forth in this Agreement.



5.  Bon Appetit's Costs of Business under Exhibit E include any change in payroll tax and any new payroll tax. If a governmental taxing authority determines at any time that sales tax applies to goods or services included in those Costs of Business in spite of Bon Appetit's use of Client's tax exemption as described in section 7, and Client has not already paid Bon Appetit for that sales tax, then Client will pay that tax to Bon Appetit within 30 days after receipt of an invoice.

### B.     Investment and Pre-Opening Expenses

Bon Appétit will fund an Investment in the Client's dining service program to fund capital improvements to the Client's premises to facilitate the dining service program, and to fund Pre-Opening Expenses, in a total sum not to exceed Three Hundred Twenty- three Thousand ($323,000) Dollars (collectively, the "Investment"). The portion of the Investment attributed to capital improvements will not exceed One Hundred Twenty Thousand ($120,000) Dollars, and the portion of the Investment attributed to Pre-Opening Expenses shall not exceed Two Hundred Three Thousand ($203,000) Dollars. The portion of the Investment attributed to capital improvements will be disbursed for items and on a schedule as agreed by Bon Appétit and Client. The portion of the Investment attributed to capital improvements will be amortized on a straight line basis from July 1, 2011 through June 30, 2021 as a Cost of Business. The Investment attributed to Pre-Opening Expenses will be amortized on a straight line basis from July 1, 2011 through June 30 2016 and will not be treated as a Cost of Business. The Client shall hold title to items funded by the Investment. Pre-opening Expenses include, but are not limited to, travel, meals, lodging, opening promotions and advertising, accounting and operating manuals and systems, interviewing and relocation, salaries and fringe benefits, crew training, and other expenses related to preparing for, and commencing performance of services for the 2011-2012  academic year. If the Agreement expires or is terminated for any reason prior to the full amortization of the Investment attributed to capital improvements, the Client is liable for and promises to pay to Bon Appétit the unamortized portion of the Investment and Interest attributed to capital improvements immediately upon expiration or termination.  If the Agreement is terminated for cause by the Client or for any reason other than cause by Bon Appétit prior to the full amortization of the Investment and Interest attributed to pre-opening expenses, the Client will not be liable for the unamortized portion of the Investment and Interest attributed to pre-opening expenses. If the Agreement is terminated by the Client for any reason other than cause or by Bon Appétit for cause prior to the full amortization of the Investment and Interest attributed to pre-opening expenses, the Client is liable for and promises to pay to Bon Appétit the unamortized portion of the Investment and Interest attributed to pre-opening expenses immediately upon expiration or termination.  Bon Appétit will provide the Client with a full accounting of Investment expenditures.

### C.     Future Investments

Future funding to Client by Bon Appétit for enhancements to the Premises, construction, etc., up to a maximum of $2,000,000 ("Future Investment"), may be provided by mutual written agreement of Client and Bon Appetit, it being understood that such agreement will provide for amortization of Future Investment as a Cost of Business, that the Client shall

hold title to items funded by Future Investment, and that in the event of expiration or termination of the Agreement prior to the full amortization of the Future Investment, the Client will be liable for and will pay to Bon Appétit the unamortized portion of the Future Investment immediately upon expiration or termination.

### D.    Credit Terms

Bon Appétit will issue a single invoice to Client each month. All amounts due to Bon Appétit shall be paid by the end of the month in which the invoice is received or within fifteen (15) days of the invoice date, whichever is later, or will be considered past-due. Past-due amounts due to Bon Appétit will be subject, at Bon Appétit's option, to a service charge of up to 0.5% per month of the unpaid balance. All costs of collection of past-due amounts including, but not limited to, reasonable attorneys' fees and costs, shall be chargeable to and paid by the Client.

### E.    Advance Payment

Client shall provide to Bon Appétit an advance payment ("Advance Payment") equal to $150,000.00 to be billed no sooner than August of each academic year. The Advance Payment shall be paid to Bon Appétit within the terms described in E above. Bon Appétit shall deduct the Advance Payment from the final invoice at the end of the then current academic year and provide the Client with a statement of reconciliation.

### F.    Catering

Bon Appétit shall provide catering services to Client on and off Premises as requested. Event arrangements shall be negotiated by the Parties on an event-by-event basis. Bon Appétit shall invoice Client for the cost of catering services on a monthly basis. Payment by Client is due in accordance with the terms described in E above.

### G.    Payroll - T & B Rates

A flat charge of 32 percent of gross payroll for managerial employees and 47.5 of gross payroll for union employees will be charged to cover payroll taxes and employee benefit costs. Such costs include medical plans, life insurance, FICA, FUI, SUI, Workers' Compensation insurance, state disability insurance, 401(k) and payroll and benefit plan preparation and processing. This rate may change as benefit, tax and other associated costs change.

### H.    Bon Appétit Vendors

In connection with Services provided hereunder, Bon Appétit shall purchase inventory, equipment, and services from various sellers and vendors selected by Bon Appétit (each a "Vendor"). Purchases from Vendors shall be made under terms Bon Appétit deems acceptable ("Vendor Terms"). In the case of both vendor selection and the establishment of vendor terms, Bon Appétit will act in accordance with the Client's best interests. All Vendor Terms are the exclusive obligation and property of Bon Appétit. Client does not have any liability under, or any right to, any Vendor Terms and no Vendor Terms will operate to reduce or

otherwise affect the amount or performance of Client's present and future liabilities, obligations of payment and performance, or indebtedness.

### I.    Termination

Termination of this agreement does not affect any obligations incurred before termination. In the event of a termination for any reason, all amounts outstanding shall become due and payable to Bon Appétit within thirty (30) days after termination.

## EXHIBIT B
### Additional Responsibilities for Operational Execution (see section 3-K)

| Section 1.    FOOD and SUPPLIES for defined operations (see Exhibit C) | BAMCO | ALBION |
|---|:---:|:---:|
| Processing of Invoices | X | |
| Payment of Invoices | X | |
| Food Purchases | X | |
| Paper/Disposables Purchases | X | |
| Cleaning Chemicals Purchases | X | |
| Purchasing or renting laundry and linen | X | |
| Furnishing uniforms | X | |
| Purchase of Office supplies | X | |
| Replacement of china/glass/silverware | X | |
| Purchase of other non-capital supplies (more than $50, less than $1,000) | X | |
| **Section 2.    NON-MANAGEMENT LABOR** | **BAMCO** | **ALBION** |
| Payment of regular full-time wages | X | |
| Payment of part-time wages | X | |
| Payment of student wages (includes work study and non-work study) | | X |
| Payment of and tracking for sick leave | X | |
| Payment of holiday time | X | |
| Processing Payroll taxes | X | |
| Providing fringe benefits and insurance | X | |
| Providing Tuition remission benefits | | X |
| Preparation of payroll | X | |
| Processing of payroll | X | |
| Training and development of employees | X | |
| **Section 3.    MANAGEMENT LABOR** | **BAMCO** | **ALBION** |
| Payment of Salaries | X | |
| payroll Taxes, fringe benefits and insurance | X | |
| Providing Tuition remission benefits | | X |
| **Section 4.    ADDITIONAL ITEMS** | **BAMCO** | **ALBION** |
| Providing Telephones and service | | X |
| Removal of trash and garbage from kitchen | X | |
| Depreciation of equipment and investment | | X |
| Conducting inventory of dishes, silverware, and other food equip. | X | |
| Replacement of expendable equipment  (pots, pans, etc.) | X | |
| Repair to infrastructure (vents to outside, gas line, electrical, etc) | | X |
| Repairing of equipment not otherwise described in this section 4, and except for repairs described in section 6 as BAMCO's responsibility | | X |
| Copying and printing | X | |
| Gas and electric utilities metered to food service | | X |
| Postage and shipping | X | |
| State/County health department food licenses | X | |
| Vehicle insurance, maintenance, fuel (one catering truck) | | X |
| Online marketing/communication  (menu's and information at www.albion.edu) | X | |

| | BAMCO | ALBION |
|---|---|---|
| Conducting Physical inventory of food and supplies (minimum of 12/31 and 6/30 annually) | X | |
| Providing Purchasing credit cards (for key managers) | X | |
| Software licenses - general | X | |
| Software licenses – POS systems and food management software | X | |
| Signage and marketing displays | X | |
| Establish and maintain customized web site for the dining program | X | |
| **Section 5.      SALES AND USE TAX** | **BAMCO** | **ALBION** |
| Processing Sales & Use taxes  non-board plan sales | | X |
| Processing Sales & Use Tax on Board Plan revenue | | X |
| **Section 6.      CLEANING** | **BAMCO** | **ALBION** |
| Equipment and ventilation hoods (Baldwin, Eat Shop, Bellemont), except for oil and grease removal described in section 7 | X | |
| Vents from hoods to outside | | X |
| Floors in kitchen/food preparation areas | | X |
| Floors in dining areas (customer areas) | | X |
| Floors in storage areas | X | |
| Floors, walls, fixtures in public areas (stairwells, halls, lobby) | | X |
| Walls (6 ft and below) | X | |
| Walls (above 6 ft) | | X |
| Ceilings and fans | | X |
| Light fixtures | | X |
| Tables and chairs | X | |
| Break rooms/lockers (foodservice associates) | X | |
| Public Restrooms | | X |
| **Section 7.      SERVICES** | **BAMCO** | **ALBION** |
| Banking receipts (deposit/transaction receipts for reconciliation) | X | |
| Credit Card transactions/daily batch | X | |
| Perform daily cash handling, revenue reconciliation, and deposits, on behalf of Client, in accordance with College policies and procedures | X | |
| Arranging Credit Card agreements/banking | | X |
| Contracted Service - Pest control | | X |
| Custodial Services | | X |
| Repair/Maintenance Service Contracts (Hobart, etc), but for only equipment that this agreement requires Albion to maintain | | X |
| Lease Agreements | | X |
| Trash removal except as otherwise described in section 4 | | X |
| Used fryer oil/grease removal | | X |
| **Section 8.      Conference Services and Lodging** (these obligations of BAMCO control over any conflicting items in sections 1-7) | **BAMCO** | **ALBION** |
| Booking of lodging visitors | X | |
| Handling of keys and payment | X | |
| Summer Conference housing | X | |
| Housekeeping (lodging) for private rooms and public space | X | |
| Reserving classrooms, athletic space, other, during non-academic calendar season | X | |

| | | |
|---|---|---|
| Audio/Visual set-up, management (year-round for events managed by Dining and Hospitality Services), including projectors, microphones, sound | X | |
| Set up of rooms in non-dining areas (where functions/events occur managed by Dining & Hospitality Services) | X | |
| Cleaning of residence hall rooms used by camp/conference attendees | X | |
| Cleaning of public spaces during camps/conferences | X | |
| Purchase and management of supplies for camps/conferences (lanyards, keycards/holders, key envelopes, etc) | X | |
| Purchase or rental, and management of, supplies for lodging (shampoo, soap, hair dryers, toilet tissue, towels, sheets, etc) | X | |

**EXHIBIT C**
**Locations of Responsibility for Bon Appétit Management Company**

Baldwin Hall
      Lower Baldwin Student Dining Hall
      Mary Sykes Room and adjacent rooms (Faculty/Staff dining and catering)
      Upper Baldwin, catering and events

Eat Shop Café & College Market (retail location in Kellogg Center)

Stockwell Library coffee shop/café (Name TBD; projected opening August 2011)

Bellemont Manor (lodging, catering, and events)

Haven House and Michigan Avenue Guest House (lodging only)

Briton Manor (President's residence – special food/beverage-related events as required)

Other locations as necessary, including catered functions across campus in various locations



**EXHIBIT D**
**Hours of Operation**

| Location | Weekday Hours | Saturday and Sunday Hours | Summer and Break Periods |
|---|---|---|---|
| Dining & Hospitality Services office | 8:00am-5:00pm | Closed | Open year-round, except when College is officially closed |
| Lower Baldwin Student Dining Hall (all-you-care-to-eat residential dining) | 7:00am-8:00pm (M-Th)<br><br>7:00am-7:30pm (Fri)<br><br>(academic year) | 8:00am-7:00pm<br><br>(academic year) | Closed* |
| Mary Sykes Room (Faculty/Staff dining) | 11:30am-1:00pm | Closed | Closed |
| Eat Shop Café & College Market (Kellogg Center retail location) | 11:30am-Midnight | 6:00pm-Midnight | Closed |
| Stockwell Library coffee shop/café (Name TBD; opens August 2011)** | 7:30am-10:00am (M-F)<br><br>7:00pm-11:00pm (Su-Th) | Closed Friday afternoon thru Sunday afternoon | TBD |
| Catering and event locations (Upper Baldwin, Mary Sykes Room and adjacent meeting rooms, Bellemont Manor, others) | As needed* | | |
| Lodging facilities (Bellemont Manor, Haven House, Michigan Ave. Guest House) | 365 days/year as needed | | |

\*Open as needed, including catering, events, camps, and conferences
\*\* Hours listed for library location are approximate and yet to be finalized. Grand Opening expected August 2011.

EXHIBIT E
Bon Appetit's Costs of Business

Bon Appetit's costs of business (to be paid as described in Exhibit A) are defined as customary and reasonable expenses, attributed directly to Bon Appetit's operation of the College's Dining & Hospitality Services Program, within the following categories:

| Costs of Business |
|---|
| Cost of food and beverages |
| Salaries and wages |
| Payroll taxes |
| Employee benefits, including worker's compensation insurance |
| Direct employee training expenses |
| Uniforms |
| Employee background checks and other hiring costs for non-management personnel |
| Laundry, linen rental, linen replacement |
| Paper supplies |
| Cleaning Supplies |
| Office supplies |
| Cellular telephone service and equipment as approved by the Contract Administrator |
| Costs of contracted services approved by the College |
| On-site printing |
| Equipment maintenance and repair |
| Catering vehicle costs |
| Equipment rental |
| Decorations and flowers |
| Direct operating supplies and smallwares |

| |
|---|
| Amortization of capital investment (as outlined in Exhibit A) |
| Costs of Insurance Premiums for specified coverage outlined in agreement |
| License and/or franchise fees as required for contracts pre-approved by the College |
| Credit Card and bank card service fees |
| Bank charges |
| Costs associated with food and catering services contributed to the College |
| Computer/technology fees. Requires approval by the College |
| Business taxes and licenses |
| Waste removal |
| Costs associated with corporately generated marketing and/or promotional materials |
| Employee relocation expenses for on-site management staff with a defined cap (pre-approval from College needed) |
| Any other reasonable expense not covered above (subject to College approval) |

| These items are excluded from the definition of Bon Appetit's Costs of Business: |
|---|
| The expense of payroll computations and the disbursement of the payroll |
| Wages/Salaries/benefits/bonuses of corporate office employees and general administrative, executive, and management officers |
| Corporate or regional office accounting expenses including costs of producing financial reports |
| Home office management costs such as transportation of management personnel, and any other indirect management costs as related to this agreement |
| Amounts paid as the result of negligence or willful misconduct of Bon Appétit or any of its agents or employees |
| Legal expenses |
| Insurance retentions or deductibles under insurance policies specified in the agreement |
| All taxes, except payroll, sales tax, and property tax |
| Memberships in national groups or organizations of any type, unless specifically approved by the |

| |
|---|
| College's Contract Administrator |
| Travel expenses of all personnel not directly assigned to Albion College |
| Bon Appetit's personal or non-College use of the facilities. Such use requires approval of the College's Contract Administrator |
| Expenses for any Bon Appétit employees to attend seminars or conferences of any type, except as specifically agreed to by the College's Contract Administrator |
| Repairs to College-owned equipment necessary as the result of the acts or omissions of Bon Appétit employees |
| Corporate accrual charges of all types, except as specifically approved by the College |
| Anything else not specifically set forth in this agreement |
| Expense of establishing and maintaining a customized web site for the dining program (exception for costs incurred at the College, such as labor for periodic menu updates) |

### AMENDMENT NUMBER ONE TO
### FOOD SERVICES AGREEMENT

This Addendum Number One to Food Services Agreement, effective November 26, 2012, is between Albion College ("Client") and Bon Appétit Management Company ("Bon Appétit") (collectively the "Parties").

WHEREAS, the Client and Bon Appétit are parties to a certain Food Services Agreement dated June 8, 2011 (the "Agreement"), pursuant to which Bon Appetit manages the Client's food service operation and facilities; and

WHEREAS, the Parties now desire to amend the aforesaid Agreement;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1.  <u>Definitions</u>.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2.  <u>Amendment of Section 2.A</u>.  Section 2.A of the Agreement is amended to delete the first two sentences of such Section and replace them with the following:

This Agreement shall become effective as of July 1, 2011 and shall remain in force until June 30, 2028, unless terminated earlier as provided in Section 2.B or 2.C ("Term"). If neither Party has provided notice of termination at least ninety (90) days in advance of June 30, 2028, or June 30 of each year thereafter that this remains in effect, and if neither Party has terminated the Agreement early under Section 2.B. or 2.C., the Agreement will renew automatically for a one-year period.

3.  <u>Amendment of Exhibit A, Section A.1</u>.  Exhibit A, Section A.1 of the Agreement is amended to delete paragraphs (b) and (c) and replace them with the following:

(b) <u>Year two (July 1, 2012 – June 30, 2013)</u>:  a Base Management Fee of the greater of $100,000 or 2% of Revenues, plus 50% of the excess of Revenues Minus Costs of Business over $1,428,022.  The total Management Fee for year two may not exceed 3% of Revenues.

(c) <u>Year three (July 1, 2013 – June 30, 2014)</u>: a Base Management Fee of the greater of $150,000 or 3% of revenues, plus 50% of the excess of Revenues Minus Costs of Business over $1,267,282.  There is no cap on the Management Fee that can be earned.

(d) <u>Years four (July 1, 2014 – June 30, 2015) and beyond</u>: a Base Management Fee of the greater of $150,000 or 3% of revenues, plus 50% of the excess of Revenues Minus Costs of Business over $1,250,332.  There is no cap on the Management Fee that can be earned.



4.    Amendment of Exhibit A, Section B.  Exhibit A, Section B of the Agreement is amended to insert the following at the end of such Section:

Bon Appétit will fund an additional Investment in the Client's dining service program to fund mutually agreed upon capital improvements to the Client's premises to facilitate the dining service program, in a total sum not to exceed Three Million ($3,000,000) Dollars (collectively, the "2013 Investment").  The 2013 Investment will be disbursed, and amortized on a straight line basis as a Cost of Business, in accordance with the schedule set forth below.  The Client shall hold title to items funded by the 2013 Investment.  If the Agreement expires or is terminated for any reason prior to the full amortization of the 2013 Investment, the Client is liable for and promises to pay to Bon Appétit the unamortized portion of the 2013 Investment immediately upon expiration or termination.  In the event the Agreement expires or is terminated before any disbursements are scheduled to be made under the table below, Bon Appétit will not advance such additional disbursements.

| Disbursement Date | Installment | Amortization Period (See Exhibit F attached) |
|---|---|---|
| Not later than May 1, 2013 | $2,000,000 | May 2013 to June 2028 |
| Not later than October 1, 2013 | $1,000,000 | October 2013 to June 2028 |

5.    Insertion of Exhibit F.  The Agreement is amended to insert Exhibit F attached hereto.

6.    Confirmation and Integration.  Except as expressly amended by this Amendment, the parties hereby confirm and ratify the Agreement in its entirety.  The Agreement, as amended hereby, constitutes the entire agreement between the parties and their predecessors pertaining to the subject matter of the Agreement, as so amended, and supersedes all prior and contemporaneous agreements and understandings of the parties and their predecessors in connection therewith.

7.    Counterparts.  This Amendment may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute but one and the same original document.

8.    Headings.  The section headings herein are for convenience only and do not define, limit or construe the contents of such sections.

*EXECUTION PAGE FOLLOWS*



IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers, all done the day and year first written above.

Albion College

By: _____
Michael L. Frandsen

Title:   VP, Finance and Administration

Date:   November 26, 2012_____

Bon Appétit Management Company

By: _____

Title: _____

Date: _____

**EXHIBIT F**
Amortization of Capital Investments

| Month-Year | July 2011 Investment $120,000.00 | May 2013 Investment $2,000,000.00 | October 2013 Investment $1,000,000.00 |
|---|---|---|---|
| July-11 | $1,000.00 | | |
| August-11 | $1,000.00 | | |
| September-11 | $1,000.00 | | |
| October-11 | $1,000.00 | | |
| November-11 | $1,000.00 | | |
| December-11 | $1,000.00 | | |
| | | | |
| January-12 | $1,000.00 | | |
| February-12 | $1,000.00 | | |
| March-12 | $1,000.00 | | |
| April-12 | $1,000.00 | | |
| May-12 | $1,000.00 | | |
| June-12 | $1,000.00 | | |
| July-12 | $1,000.00 | | |
| August-12 | $1,000.00 | | |
| September-12 | $1,000.00 | | |
| October-12 | $1,000.00 | | |
| November-12 | $1,000.00 | | |
| December-12 | $1,000.00 | | |
| | | | |
| January-13 | $1,000.00 | | |
| February-13 | $1,000.00 | | |
| March-13 | $1,000.00 | | |
| April-13 | $1,000.00 | | |
| May-13 | $1,000.00 | $10,989.00 | |
| June-13 | $1,000.00 | $10,989.00 | |
| July-13 | $1,000.00 | $10,989.00 | |
| August-13 | $1,000.00 | $10,989.00 | |
| September-13 | $1,000.00 | $10,989.00 | |
| October-13 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-13 | $1,000.00 | $10,989.00 | $5,650.00 |

MLF

| | | | |
|---|---|---|---|
| December-13 | $1,000.00 | $10,989.00 | $5,650.00 |
| | | | |
| January-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| December-14 | $1,000.00 | $10,989.00 | $5,650.00 |
| | | | |
| January-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| December-15 | $1,000.00 | $10,989.00 | $5,650.00 |
| | | | |
| January-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-16 | $1,000.00 | $10,989.00 | $5,650.00 |

| | | | |
|---|---|---|---|
| December-16 | $1,000.00 | $10,989.00 | $5,650.00 |
| | | | |
| January-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| December-17 | $1,000.00 | $10,989.00 | $5,650.00 |
| | | | |
| January-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| December-18 | $1,000.00 | $10,989.00 | $5,650.00 |
| | | | |
| January-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-19 | $1,000.00 | $10,989.00 | $5,650.00 |



| | | | |
|---|---|---|---|
| December-19 | $1,000.00 | $10,989.00 | $5,650.00 |
| January-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| August-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| September-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| October-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| November-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| December-20 | $1,000.00 | $10,989.00 | $5,650.00 |
| January-21 | $1,000.00 | $10,989.00 | $5,650.00 |
| February-21 | $1,000.00 | $10,989.00 | $5,650.00 |
| March-21 | $1,000.00 | $10,989.00 | $5,650.00 |
| April-21 | $1,000.00 | $10,989.00 | $5,650.00 |
| May-21 | $1,000.00 | $10,989.00 | $5,650.00 |
| June-21 | $1,000.00 | $10,989.00 | $5,650.00 |
| July-21 | | $10,989.00 | $5,650.00 |
| August-21 | | $10,989.00 | $5,650.00 |
| September-21 | | $10,989.00 | $5,650.00 |
| October-21 | | $10,989.00 | $5,650.00 |
| November-21 | | $10,989.00 | $5,650.00 |
| December-21 | | $10,989.00 | $5,650.00 |
| January-22 | | $10,989.00 | $5,650.00 |
| February-22 | | $10,989.00 | $5,650.00 |
| March-22 | | $10,989.00 | $5,650.00 |
| April-22 | | $10,989.00 | $5,650.00 |
| May-22 | | $10,989.00 | $5,650.00 |
| June-22 | | $10,989.00 | $5,650.00 |
| July-22 | | $10,989.00 | $5,650.00 |
| August-22 | | $10,989.00 | $5,650.00 |
| September-22 | | $10,989.00 | $5,650.00 |
| October-22 | | $10,989.00 | $5,650.00 |
| November-22 | | $10,989.00 | $5,650.00 |



| | | |
|---|---|---|
| December-22 | $10,989.00 | $5,650.00 |
| January-23 | $10,989.00 | $5,650.00 |
| February-23 | $10,989.00 | $5,650.00 |
| March-23 | $10,989.00 | $5,650.00 |
| April-23 | $10,989.00 | $5,650.00 |
| May-23 | $10,989.00 | $5,650.00 |
| June-23 | $10,989.00 | $5,650.00 |
| July-23 | $10,989.00 | $5,650.00 |
| August-23 | $10,989.00 | $5,650.00 |
| September-23 | $10,989.00 | $5,650.00 |
| October-23 | $10,989.00 | $5,650.00 |
| November-23 | $10,989.00 | $5,650.00 |
| December-23 | $10,989.00 | $5,650.00 |
| January-24 | $10,989.00 | $5,650.00 |
| February-24 | $10,989.00 | $5,650.00 |
| March-24 | $10,989.00 | $5,650.00 |
| April-24 | $10,989.00 | $5,650.00 |
| May-24 | $10,989.00 | $5,650.00 |
| June-24 | $10,989.00 | $5,650.00 |
| July-24 | $10,989.00 | $5,650.00 |
| August-24 | $10,989.00 | $5,650.00 |
| September-24 | $10,989.00 | $5,650.00 |
| October-24 | $10,989.00 | $5,650.00 |
| November-24 | $10,989.00 | $5,650.00 |
| December-24 | $10,989.00 | $5,650.00 |
| January-25 | $10,989.00 | $5,650.00 |
| February-25 | $10,989.00 | $5,650.00 |
| March-25 | $10,989.00 | $5,650.00 |
| April-25 | $10,989.00 | $5,650.00 |
| May-25 | $10,989.00 | $5,650.00 |
| June-25 | $10,989.00 | $5,650.00 |
| July-25 | $10,989.00 | $5,650.00 |
| August-25 | $10,989.00 | $5,650.00 |
| September-25 | $10,989.00 | $5,650.00 |
| October-25 | $10,989.00 | $5,650.00 |
| November-25 | $10,989.00 | $5,650.00 |



| | | | |
|---|---|---|---|
| December-25 | | $10,989.00 | $5,650.00 |
| | | | |
| January-26 | | $10,989.00 | $5,650.00 |
| February-26 | | $10,989.00 | $5,650.00 |
| March-26 | | $10,989.00 | $5,650.00 |
| April-26 | | $10,989.00 | $5,650.00 |
| May-26 | | $10,989.00 | $5,650.00 |
| June-26 | | $10,989.00 | $5,650.00 |
| July-26 | | $10,989.00 | $5,650.00 |
| August-26 | | $10,989.00 | $5,650.00 |
| September-26 | | $10,989.00 | $5,650.00 |
| October-26 | | $10,989.00 | $5,650.00 |
| November-26 | | $10,989.00 | $5,650.00 |
| December-26 | | $10,989.00 | $5,650.00 |
| | | | |
| January-27 | | $10,989.00 | $5,650.00 |
| February-27 | | $10,989.00 | $5,650.00 |
| March-27 | | $10,989.00 | $5,650.00 |
| April-27 | | $10,989.00 | $5,650.00 |
| May-27 | | $10,989.00 | $5,650.00 |
| June-27 | | $10,989.00 | $5,650.00 |
| July-27 | | $10,989.00 | $5,650.00 |
| August-27 | | $10,989.00 | $5,650.00 |
| September-27 | | $10,989.00 | $5,650.00 |
| October-27 | | $10,989.00 | $5,650.00 |
| November-27 | | $10,989.00 | $5,650.00 |
| December-27 | | $10,989.00 | $5,650.00 |
| | | | |
| January-28 | | $10,989.00 | $5,650.00 |
| February-28 | | $10,989.00 | $5,650.00 |
| March-28 | | $10,989.00 | $5,650.00 |
| April-28 | | $10,989.00 | $5,650.00 |
| May-28 | | $10,989.00 | $5,650.00 |
| June-28 | | $10,991.00 | $5,600.00 |
| | | | |
| **Total** | $120,000.00 | $2,000,000.00 | $1,000,000.00 |



### AMENDMENT NUMBER TWO TO
### FOOD SERVICES AGREEMENT

This Amendment Number Two to Food Services Agreement, effective July 21, 2014, is between Albion College ("Client") and Bon Appétit Management Company ("Bon Appétit") (collectively the "Parties").

WHEREAS, the Client and Bon Appétit are parties to a certain Food Services Agreement dated June 8, 2011 and that certain Amendment One dated November 26, 2012 ( collectively the "Agreement"), pursuant to which Bon Appetit manages the Client's food service operation and facilities; and

WHEREAS, the Parties now desire to amend the aforesaid Agreement;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1. <u>Definitions</u>. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2. <u>Insertion of Section 3(L)</u>. The following is added to the Agreement as Section 3(L):

L. Bon Appetit shall conduct a campus wide survey no later than October 15th of each academic year. In collaboration with Client, the survey shall seek to identify gaps in service, quality and any other issues of significance. Upon completion, Client and Bon Appetit shall work together to develop a corrective action plan to address any identified, mutually agreed upon gaps. Bon Appetit shall conduct a follow-up survey no later than April 1st to ensure progress has been made in accordance with the corrective action plan.

3. <u>Amendment of Exhibit A, Section A.1</u>. Exhibit A, Section A.1 of the Agreement is amended to delete paragraphs (a), (b), and (c) and replace them with the following:

(a) July 1, 2014 - June 30, 2015: a Base Management Fee of the greater of $160,000 or 1% of revenues, plus 50% of the excess revenues minus cost of business over the annual override. Total fees and earnings to Bon Appetit may not exceed 5% of all program revenues.

(b) July 1, 2015 - June 30, 2016: a Base Management Fee of the greater of $170,000 or 1% of revenues, plus 50% of the excess revenues minus cost of business over the annual override. Total fees and earnings to Bon Appetit may not exceed 5% of all program revenues.

(c) July 1, 2016 - June 30, 2017: a Base Management Fee of the greater of $185,000 or 1% of revenues, plus 50% of the excess revenues minus cost of business over the annual override. Total fees and earnings to Bon Appetit may not exceed 5% of all program revenues.

(d) July 1, 2017 - June 30, 2018: a Base Management Fee of the greater of $200,000 or 1% of revenues, plus 50% of the excess revenues minus cost of business over the annual override. Total fees and earnings to Bon Appetit may not exceed 5% of all program revenues.

Upon achievement of a specified level of Revenue (the "Override Amount") Bon Appétit and Client shall split equally any Revenues (minus applicable Costs of Business) earned in excess of the Override

Amount. Bon Appétit's share shall not exceed five percent (5%) of total Revenues. Bon Appétit and Client shall mutually agree upon the Override Amount for the upcoming academic year during Client's budget process in April and May, but no later than June 1. Efforts will be made to identify revenues and cost of business that will mirror Client's internal budget reporting. Client will provide Bon Appetit with an assurance of minimum revenues from sales of meal plans, and Bon Appetit will provide Client with an assurance of minimum revenues from commercial efforts such as Summer Conference Sales. Both parties will work to determine the estimated cost of business.

4.    <u>Amendment of Exhibit A, Section E</u>.  Exhibit A, Section E of the Agreement is amended to increase the Advance Payment amount from One Hundred Fifty Thousand Dollars ($150,000) to Two Hundred Thousand Dollars ($200,000).

5.    <u>Confirmation and Integration</u>.  Except as expressly amended by this Amendment, the parties hereby confirm and ratify the Agreement in its entirety.  The Agreement, as amended hereby, constitutes the entire agreement between the parties and their predecessors pertaining to the subject matter of the Agreement, as so amended, and supersedes all prior and contemporaneous agreements and understandings of the parties and their predecessors in connection therewith.

6.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute but one and the same original document.

7.    <u>Headings</u>.  The section headings herein are for convenience only and do not define, limit or construe the contents of such sections.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers, all done the day and year first written above.

Albion College                                Bon Appétit Management Company

By: _____        By: _____

Name:  Maurr A. Ditzler                     Name:  Fedde Bauccio

Title:  President                              Title:  CEO

Date:  7/16/14                               Date:  8/4/14

By: _____

Name:  Mark S. Holbrook

Title:  Controller

Date:  7/18/14

## AMENDMENT NUMBER THREE TO
## FOOD SERVICES AGREEMENT

This Amendment Number Three to Food Services Agreement, effective July 1, 2018, is between Albion College ("Client") and Bon Appétit Management Co. ("Bon Appétit") (collectively the "Parties").

WHEREAS, Client and Bon Appétit are parties to a certain Food Services Agreement dated June 8, 2011, as amended by that that certain Amendment One dated November 26, 2012 and by that certain Amendment Two dated July 21, 2014 (collectively the "Agreement"), pursuant to which Bon Appétit manages Client's food service operation and facilities; and

WHEREAS, the Parties now desire to amend the aforesaid Agreement;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1.     Definitions.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2.     Amendment of Exhibit A, Section A.1.  Exhibit A, Section A.1 of the Agreement is amended to delete paragraphs (a), (b), and (c) and replace them with the following:

July 1, 2018 - June 30, 2019: a Base Management Fee of the greater of $215,000 or 1% of revenues, plus 50% of the excess revenues minus cost of business over the annual override. Total fees and earnings to Bon Appétit may not exceed 5% of all program revenues.

Upon achievement of a specified level of Revenue (the "Override Amount"), Bon Appétit and Client shall split equally any Revenues (minus applicable Costs of Business) earned in excess of the Override Amount. Bon Appétit's share shall not exceed five percent (5%) of total Revenues. Bon Appétit and Client shall mutually agree upon the Override Amount for the upcoming academic year during Client's budget process in April and May, but no later than June 1. Efforts will be made to identify revenues and cost of business that will mirror Client's internal budget reporting. Client will provide Bon Appétit with an assurance of minimum revenues from sales of meal plans, and Bon Appétit will provide Client with an assurance of minimum revenues from commercial efforts such as Summer Conference Sales. Both parties will work to determine the estimated cost of business.

3.     Confirmation and Integration.  Except as expressly amended by this Amendment, the parties hereby confirm and ratify the Agreement in its entirety.  The Agreement, as amended hereby, constitutes the entire agreement between the parties and their predecessors pertaining to the subject matter of the Agreement, as so amended, and supersedes all prior and contemporaneous agreements and understandings of the parties and their predecessors in connection therewith.

4.     Counterparts.  This Amendment may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute but one and the

same original document.

     5.    <u>Headings</u>.  The section headings herein are for convenience only and do not define, limit or construe the contents of such sections.

     IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers, all done the day and year first written above.

Albion College

Bon Appétit Management Co.

By: _____

By: _____

Name: Deanna S. McCormick

Name: Fedele Bauccio

Title:  Vice President for Finance and
       Administration

Title:  Chief Executive Officer

Date: 7 August 2018

Date:  08/10/18

2

## AMENDMENT NUMBER FOUR TO
## FOOD SERVICES AGREEMENT

This Amendment Number Four to Food Services Agreement, effective March 1, 2019, is between Albion College ("Client") and Bon Appétit Management Co. ("Bon Appétit") (collectively the "Parties").

WHEREAS, Client and Bon Appétit are parties to a certain Food Services Agreement dated June 8, 2011, as amended by that that certain Amendment One dated November 26, 2012, by that certain Amendment Two dated July 21, 2014 and by that certain Amendment Three dated July 1, 2018 (collectively the "Agreement"), pursuant to which Bon Appétit manages Client's food service operation and facilities; and

WHEREAS, the Parties now desire to amend the aforesaid Agreement;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1.    Definitions.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2.    Amendment of Exhibit A, Section G.  Exhibit A, Section G of the Agreement is deleted in its entirety and replaced with the following:

**G.    Payroll - T & B Rates**

A flat charge of 32 percent of gross payroll for managerial employees and 37 percent of gross payroll for union employees will be charged to cover payroll taxes and employee benefit costs.  Such costs include medical plans, life insurance, FICA, FUI, SUI, Workers' Compensation insurance, state disability insurance, 401(k) and payroll and benefit plan preparation and processing.  This rate may change as benefit, tax and other associated costs change.

3.    Confirmation and Integration.  Except as expressly amended by this Amendment, the parties hereby confirm and ratify the Agreement in its entirety.  The Agreement, as amended hereby, constitutes the entire agreement between the parties and their predecessors pertaining to the subject matter of the Agreement, as so amended, and supersedes all prior and contemporaneous agreements and understandings of the parties and their predecessors in connection therewith.

4.    Counterparts.  This Amendment may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute but one and the same original document.

5.    Headings.  The section headings herein are for convenience only and do not define, limit or construe the contents of such sections.

{Signatures on next page.}

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers, all done the day and year first written above.

Albion College                                      Bon Appétit Management Co.


By: _____          By: _____

Name: Deanna S. McCormick                 Name: Fedele Bauccio

Title:  Vice President for Finance and          Title:   Chief Executive Officer
        Administration

Date:  24 April 2019                            Date:    05/01/19

2

**AMENDMENT NUMBER FIVE TO**
**FOOD SERVICES AGREEMENT**

This Amendment Number Five to Food Services Agreement, dated July 1, 2019, is between Albion College ("Client") and Bon Appétit Management Co. ("Bon Appétit") (collectively the "Parties").

WHEREAS, Client and Bon Appétit are parties to a certain Food Services Agreement dated June 8, 2011, as amended by that that certain Amendment One dated November 26, 2012, by that certain Amendment Two dated July 21, 2014, by that certain Amendment Three dated July 1, 2018, and by that certain Amendment Four dated March 1, 2019 (collectively the "Agreement"), pursuant to which Bon Appétit manages Client's food service operation and facilities; and

WHEREAS, the Parties now desire to amend the aforesaid Agreement;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1.      <u>Definitions</u>.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2.      <u>Amendment of Exhibit A</u>.  Exhibit A is deleted in its entirety and replaced with Exhibit A attached hereto.

3.      <u>Deletion of Exhibit E</u>.  Exhibit E is deleted in its entirety.

4.      <u>Confirmation and Integration</u>.  This Amendment is effective July 1, 2019. Except as expressly amended by this Amendment, the parties hereby confirm and ratify the Agreement in its entirety.  The Agreement, as amended hereby, constitutes the entire agreement between the parties and their predecessors pertaining to the subject matter of the Agreement, as so amended, and supersedes all prior and contemporaneous agreements and understandings of the parties and their predecessors in connection therewith.

5.      <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute but one and the same original document.

6.      <u>Headings</u>.  The section headings herein are for convenience only and do not define, limit or construe the contents of such sections.

{Signatures on next page.}

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers, all done the day and year first written above.

Albion College                          Bon Appétit Management Co.


By: _____          By: _____

Name: Deanna S. McCormick               Name: Fedele Bauccio

Title:  Vice President for Finance and  Title:  Chief Executive Officer
        Administration

Date:  13 June 2019                     Date:  06/13/19

2

## EXHIBIT A

## FINANCIAL ARRANGEMENTS

### Albion College

**A.**    **Profit and Loss Basis**

Bon Appétit will operate its Services for its own account on a profit and loss basis. Profits shall be the excess, if any, of Gross Sales during any fiscal year over the sum of (a) all direct and indirect costs of performing the Services, (b) the amortization expense described below, and (c) the cumulative operating deficit, if any, from prior operating periods during the term of this Agreement.

Prices shall be determined by mutual consent between Bon Appétit and Client; provided, however, that in the event of material cost changes, whether taxes, labor, merchandise, equipment, or otherwise, including but not limited to any change in any federal, state or local law including regulatory or legislative mandates, it is agreed that Bon Appétit shall have the right to adjust said prices to reflect said increases. Bon Appetit will discuss all price adjustments with the Client prior to any such price adjustment taking effect.

**B.**    **Meal Plans, Casual Meal Rates and Conference Rates**

The number of Board plan feeding days per month and for the total academic year will be decided upon prior to the beginning of the academic year. If there is a reduction in the number of Board days, Bon Appétit will be allowed to increase the daily rates to cover its fixed operating costs. Client shall pay Bon Appétit the following daily reimbursements for each meal plan participant.

There will be 204 board days in the 2019-2020 academic year.

Academic year:  2019 - 2020

| Number of Boarders | | | Daily Rate per Meal Plan | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Block 15 | Block 18 | Block 21 | 75 Com Block | 100 Com Block | 125 Com Block | Fraternity |
| 1001 | - | 1010 | $ 18.59 | $ 19.43 | $ 22.42 | $ 11.25 | $ 12.06 | $ 8.80 | $ 15.46 |
| 1011 | - | 1020 | $ 18.50 | $ 19.35 | $ 22.33 | $ 11.16 | $ 11.98 | $ 8.71 | $ 15.37 |
| 1021 | - | 1030 | $ 18.42 | $ 19.26 | $ 22.24 | $ 11.08 | $ 11.89 | $ 8.63 | $ 15.29 |
| 1031 | - | 1040 | $ 18.33 | $ 19.18 | $ 22.16 | $ 10.99 | $ 11.81 | $ 8.54 | $ 15.20 |
| 1041 | - | 1050 | $ 18.25 | $ 19.10 | $ 22.08 | $ 10.91 | $ 11.73 | $ 8.46 | $ 15.12 |
| 1051 | - | 1060 | $ 18.17 | $ 19.02 | $ 22.00 | $ 10.83 | $ 11.65 | $ 8.38 | $ 15.04 |
| 1061 | - | 1070 | $ 18.09 | $ 18.94 | $ 21.92 | $ 10.75 | $ 11.57 | $ 8.30 | $ 14.96 |
| 1071 | - | 1080 | $ 18.01 | $ 18.86 | $ 21.84 | $ 10.67 | $ 11.49 | $ 8.22 | $ 14.88 |
| 1081 | - | 1090 | $ 17.94 | $ 18.78 | $ 21.76 | $ 10.60 | $ 11.41 | $ 8.15 | $ 14.81 |
| 1091 | - | 1100 | $ 17.86 | $ 18.71 | $ 21.69 | $ 10.52 | $ 11.34 | $ 8.07 | $ 14.73 |
| 1101 | - | 1110 | $ 17.79 | $ 18.63 | $ 21.62 | $ 10.45 | $ 11.26 | $ 8.00 | $ 14.66 |

3

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1111 | - | 1120 | $ | 17.72 | $ | 18.56 | $ 21.54 | $ | 10.38 | $ | 11.19 | $ 7.93 | $ 14.59 |
| 1121 | - | 1130 | $ | 17.65 | $ | 18.49 | $ 21.47 | $ | 10.31 | $ | 11.12 | $ 7.86 | $ 14.52 |
| 1131 | - | 1140 | $ | 17.58 | $ | 18.42 | $ 21.40 | $ | 10.24 | $ | 11.05 | $ 7.79 | $ 14.45 |
| 1141 | - | 1150 | $ | 17.51 | $ | 18.35 | $ 21.34 | $ | 10.17 | $ | 10.98 | $ 7.72 | $ 14.38 |
| 1151 | - | 1160 | $ | 17.44 | $ | 18.29 | $ 21.27 | $ | 10.10 | $ | 10.92 | $ 7.65 | $ 14.31 |
| 1161 | - | 1170 | $ | 17.38 | $ | 18.22 | $ 21.20 | $ | 10.04 | $ | 10.85 | $ 7.59 | $ 14.25 |
| 1171 | - | 1180 | $ | 17.31 | $ | 18.16 | $ 21.14 | $ | 9.97 | $ | 10.79 | $ 7.52 | $ 14.18 |
| 1181 | - | 1190 | $ | 17.25 | $ | 18.09 | $ 21.07 | $ | 9.91 | $ | 10.72 | $ 7.46 | $ 14.12 |
| 1191 | - | 1200 | $ | 17.19 | $ | 18.03 | $ 21.01 | $ | 9.84 | $ | 10.66 | $ 7.40 | $ 14.06 |
| 1201 | - | 1210 | $ | 17.12 | $ | 17.97 | $ 20.95 | $ | 9.78 | $ | 10.60 | $ 7.33 | $ 13.99 |

*Rates for total sign ups above or below the sliding scale to be mutually agreed.*

Client and Bon Appétit will make efforts to identify and communicate necessary information for predicting meal participant billing. Bon Appétit and Client shall meet on a routine basis to review and forecast meal participant billing throughout the academic year.

Client shall pay Bon Appétit the following reimbursements for casual meal sales. Client will be responsible for all point-of-sale processes, including credit card and cash management processes.

Academic year:  2019 - 2020

| Meal | Charge |
|---|---|
| Breakfast | $8.75 |
| Lunch | $10.50 |
| Dinner | $10.50 |
| Faculty/Staff | $6.10 |
| Department Charge | $6.10 |

Client shall pay Bon Appétit the following reimbursements for conference meal sales.

Academic year:  2019 - 2020

| Meal | Charge |
|---|---|
| Breakfast | $8.75 |
| Lunch | $10.50 |
| Dinner | $10.50 |

Board rates shall remain the same as set forth in the table above for a period of two years (during the 2019-2020 and 2020-2021 academic years) unless, for the 2020-2021 academic year, the national or regional Consumer Price Index – Food Away From Home over the prior year is greater than 2.50%. Should such published index rate exceed 2.50%, the annual board rate increase will be equal to the difference between such published index rate and 2.50%. Prices for other products and services will increase in the 2020-2021 academic year by an amount to be negotiated.

Board rates and prices for other Products and Services will increase in each subsequent year by an amount to be negotiated, taking into account population, hours of operation, other

4

conditions, labor costs (including but not limited to benefits and insurance costs), product costs, fuel costs, federal, state and local tax structure, any change in federal, state or local law including regulatory or legislative mandates, any other levy or tax that impacts Bon Appétit's services, and variances between operating conditions as described by Client prior to execution of this Agreement and actual operating conditions during the Term, including without limitation student population, maintenance expenses and utility costs. Changes in board rates and prices shall be not less than the increase in the national or regional Consumer Price Index – Food Away From Home over the prior year.

Bon Appétit shall bill Client on a weekly basis for all reimbursable meals. Client shall remit to Bon Appétit the aggregate reimbursement within fifteen (15) days of receipt of the billing.

Client shall remit the total amount of cash, credit card and debit card sales, less credit card merchant fees, to Bon Appétit on a monthly basis.

A complete reconciliation of sales shall be provided by Client with each remittance.

## C.   Investments

Bon Appétit has previously funded an investment in Client's dining service program to fund capital improvements to Client's premises to facilitate the dining service program in a total sum of One Hundred Twenty Thousand ($120,000) Dollars (the "Original Investment"). Bon Appétit has been amortizing the Original Investment on a straight line basis. As of June 30, 2019, the remaining balance of the Original Investment is Twenty-Four Thousand ($24,000) Dollars. Bon Appétit will amortize the remaining balance of the Original Investment from June 2019 until June 2021 on a straight line basis (see Exhibit F attached), with amortization reimbursable to Bon Appétit on a monthly basis.  Client shall hold title to items funded by the Original Investment.  If this Agreement expires or is terminated for any reason prior to the full amortization of the Original Investment, Client is liable for and promises to pay to Bon Appétit the unamortized portion of the Original Investment immediately upon expiration or termination.

Bon Appétit has previously funded an investment in Client's dining service program to fund mutually agreed upon capital improvements to Client's premises to facilitate the dining service program in a total sum of Three Million ($3,000,000) Dollars (the "2013 Investment"). Bon Appétit has been amortizing the 2013 Investment on a straight line basis. As of June 30, 2019, the remaining balance of the 2013 Investment is One Million Seven Hundred Ninety-Six Thousand Four Hundred Sixty-Seven ($1,796,467) Dollars. Bon Appétit will amortize the remaining balance of the Original Investment from June 2019 until June 2028 on a straight line basis (see Exhibit F attached), with amortization reimbursable to Bon Appétit on a monthly basis.  Client shall hold title to items funded by the 2013 Investment.  If this Agreement expires or is terminated for any reason prior to the full amortization of the 2013 Investment, Client is liable for and promises to pay to Bon Appétit the unamortized portion of the 2013 Investment immediately upon expiration or termination.

In the event Client requests that Bon Appétit utilize Investment funds for purposes other than those described in Bon Appétit's proposal, or chooses to implement improvements on a

schedule that differs from the schedule described in the proposal (collectively, "Client Elections"), it is acknowledged that adherence to such Client Elections may impact revenues, expenses, and/or operating efficiencies, and thus may impact the pro forma. In such event, Bon Appétit and Client shall mutually agree upon the potential effect of such Client Elections on Bon Appétit's ability to achieve its pro forma and the Parties will mutually agree to modify the financial arrangements between them in consideration thereof.

**D.    Future Investments**

Future funding by Bon Appétit for enhancements to the Premises, construction, etc. may be generated by incorporating the amounts necessary to complete such projects into the primary daily rates. These additional special project amounts may be added to Bon Appétit's annual board rate increases for that year resulting in new primary board rates, due to inflation or other operational factors.

**E.    Credit Terms**

All amounts due to Bon Appétit shall be paid by the end of the month in which the invoice is received or within fifteen (15) days of the invoice date, whichever is later, or will be considered past-due. Past-due amounts due to Bon Appétit will be subject, at Bon Appétit's option, to a service charge of up to 0.5% per month of the unpaid balance. All costs of collection of past-due amounts including, but not limited to, reasonable attorneys' fees and costs, shall be chargeable to and paid by Client.

**F.    Advance Payment**

Client shall provide to Bon Appétit an advance payment ("Advance Payment'") equal to Two Hundred Thousand ($200,000) Dollars to be billed no sooner than August 1 of each academic year. The Advance Payment shall be paid to Bon Appétit within the terms described in Exhibit A, Section E above. Bon Appétit shall deduct the Advance Payment from the final invoice at the end of the then current academic year and provide the Client with a statement of reconciliation.

**G.    Catering**

Bon Appétit shall provide catering services to Client on and off Premises as requested. Event arrangements shall be negotiated by the Parties on an event-by-event basis. Bon Appétit shall invoice Client for the cost of catering services on a monthly basis. Payment by Client is due in accordance with the terms described in Exhibit A, Section E above.

**H.    Payroll - T & B Rates**

A flat charge of thirty-two (32%) percent of gross payroll for managerial employees and thirty-seven (37%) percent of gross payroll for union employees will be reflected on the profit and loss statement to cover payroll taxes and employee benefit costs. Such costs include medical plans, life insurance, FICA, FUI, SUI, Workers' Compensation insurance, state disability insurance, 401(k) and payroll and benefit plan preparation and processing, and costs imposed due

changes in any federal, state or local law including regulatory or legislative mandates, and legal costs. These rates may change as benefit, tax and other associated costs change.

**I.      Bon Appétit Vendors**

In connection with Services provided hereunder, Bon Appétit shall purchase inventory, equipment, and services from various sellers and vendors selected by Bon Appétit at its sole discretion (each a "Vendor"). Purchases from Vendors shall be made under such financial and contract terms Bon Appétit deems in its sole discretion as acceptable ("Vendor Terms"). All Vendor Terms are the exclusive obligation and property of Bon Appétit. Client does not have any liability under, or any right to, any Vendor Terms and no Vendor Terms will operate to reduce or otherwise affect the amount or performance of Client's obligations hereunder.

Notwithstanding the foregoing, Bon Appétit shall credit the profit and loss statement monthly with a purchasing volume credit based on four percent (4%) of the nominated food product purchases made by Bon Appétit on Client's behalf during that month. Nominated purchases shall mean those food product items purchased from Bon Appétit's approved Vendors.

**J.      Termination**

Termination of this Agreement does not affect any obligations incurred before termination. In the event of a termination for any reason, all amounts outstanding shall become due and payable to Bon Appétit within thirty (30) days after termination.

**K.      Exclusivity**

Bon Appétit will have exclusive rights to provide Food Services at any campus building and space where students can use meal board plans. Bon Appétit may provide catering services in any campus building or space, but Bon Appétit will have exclusive rights to prohibit the use of the kitchen Facilities to any external caterers or vendors in the following buildings and spaces:

- Baldwin Hall
- Library Café (outside food may be brought into the public spaces in the Library for special events)
- Eat Shop Café (outside food may be brought into the public spaces in the Kellogg Center for special events)

## AMENDMENT NUMBER SIX TO
## FOOD SERVICES AGREEMENT

This Amendment Number Six to Food Services Agreement, dated August 1, 2019, is between Albion College ("Client") and Bon Appétit Management Co. ("Bon Appétit") (collectively the "Parties").

WHEREAS, Client and Bon Appétit are parties to a certain Food Services Agreement dated June 8, 2011, as amended by that that certain Amendment One dated November 26, 2012, by that certain Amendment Two dated July 21, 2014, by that certain Amendment Three dated July 1, 2018, by that certain Amendment Four dated March 1, 2019, and by that certain Amendment Five dated July 1, 2019 (collectively the "Agreement"), pursuant to which Bon Appétit manages Client's food service operation and facilities; and

WHEREAS, the Parties now desire to amend the aforesaid Agreement;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1. <u>Definitions</u>. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2. <u>Addition of Exhibit A, Section L</u>. Exhibit A is amended with the addition of the following Section L:

> Bon Appétit will submit a signing bonus to Client in the amount of Two Hundred Fifteen Thousand ($215,000) Dollars (the "Signing Bonus"). The Signing Bonus will be disbursed immediately upon the execution, by both Parties, of Amendment Number Six to this Agreement. Bon Appétit will amortize the Signing Bonus from August 2019 until January 2022 on a straight line basis. If this Agreement expires, or is terminated by Client pursuant to Section 2(B) of the Agreement or by Bon Appétit pursuant to Section 2(C) of the Agreement, prior to the full amortization of the Signing Bonus, Client is liable for and promises to pay to Bon Appétit the unamortized portion of the Signing Bonus immediately upon expiration or termination.

3. <u>Confirmation and Integration</u>. This Amendment is effective August 1, 2019. Except as expressly amended by this Amendment, the parties hereby confirm and ratify the Agreement in its entirety. The Agreement, as amended hereby, constitutes the entire agreement between the parties and their predecessors pertaining to the subject matter of the Agreement, as so amended, and supersedes all prior and contemporaneous agreements and understandings of the parties and their predecessors in connection therewith.

4. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute but one and the same original document.

5. <u>Headings</u>. The section headings herein are for convenience only and do not define, limit or construe the contents of such sections.

{Signatures on next page.}

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers, all done the day and year first written above.

Albion College                                        Bon Appétit Management Co.


By: _____          By: _____

Name: Deanna S. McCormick                 Name: Fedele Bauccio

Title:  Vice President for Finance and        Title:   Chief Executive Officer
        Administration

Date: _____8/12/19_____               Date:  __08/19/19_____